B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br><br>A. Cotten Wright, Trustee for Yellowstone<br>Transportation Group, Inc. | DEFENDANTS<br>Dionne Waldron McNeal, a/k/a Dionne Waldron,<br>Andre Issac, and<br>Mango Capital, Inc. |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Grier Wright Martinez, PA<br>521 E. Morehead St., Ste. 440<br>Charlotte, NC 28202<br>704/375.3720 | **ATTORNEYS** (If Known) |

| PARTY (Check One Box Only)<br>☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor       ☐ Other<br>☒ Trustee | PARTY (Check One Box Only)<br>☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor       ☒ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Recover certain fraudulent transfers, to recover unauthorized post-petition transfers, and to recover damages from Waldron and Isaac for breaching their fiduciary duty to YTG.

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐1 13-Recovery of money/property - §548 fraudulent transfer
☐2 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation,
    actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation
    (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐3 02-Other (e.g. other actions that would have been brought in state court
    if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $ 805,067.53 |

Other Relief Sought

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Yellowstone Transportation Group, Inc. | BANKRUPTCY CASE NO.<br>21-30050 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Western | DIVISION OFFICE<br>Charlotte | NAME OF JUDGE<br>Beyer |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>*A. Cotten Wright, Trustee* | | |
| DATE<br><br>August 16, 2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>A. Cotten Wright | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| In re:<br><br>Yellowstone Transportation Group, Inc.,<br><br>　　　　　　　　　　　　　Debtor. | Case No. 21-30050<br><br>Chapter 7 |
| A. Cotten Wright, Trustee,<br><br>　　　　　　　　　　　　　Plaintiff,<br><br>v.<br><br>Dionne Waldron McNeal, a/k/a Dionne<br>Waldron, Andre Isaac, and<br>Mango Capital, Inc.,<br><br>　　　　　　　　　　　　　Defendants. | Adversary Proceeding 21-_____ |

## **COMPLAINT**

A. Cotten Wright, Trustee ("Trustee" or "Plaintiff"), through counsel, complaining against Dionne Waldron McNeal, a/k/a Dionne Waldron ("Waldron"), Andre Isaac ("Isaac"), and Mango Capital, Inc. ("Mango" and together with Waldron and Isaac, "Defendants") respectfully alleges as follows:

## **PARTIES, JURISDICTION AND VENUE**

1.　　　Plaintiff is the duly appointed chapter 7 trustee in the above-captioned bankruptcy case for Yellowstone Transportation Group, Inc. ("YTG"), Case No. 21-30050 (the "Bankruptcy Case") pending before the United States Bankruptcy Court for the Western District of North Carolina (the "Bankruptcy Court").

2.　　　YTG is a North Carolina corporation with an address of 301 McCullough Dr., Ste 400, Charlotte, NC 28262.

3.    On information and belief, Waldron is a resident of Maryland having an address of 7421 Kathydale Rd., Pikesville, MD 21208. On information and belief, Waldron has been chief executive officer ("CEO") of YTG since at least September 14, 2020.

4.    Isaac is a resident of New York having an address of 21 De Sales Place, #3F, Brooklyn, NY, 11207.[1] Isaac is the sole shareholder of YTG. Isaac has been president ("President") of YTG since at least December 18, 2020 and is a current Officer of YTG.

5.    Mango Capital, Inc. is a Missouri corporation formed on December 28, 2017, with an address of 303 N Stadium Blvd, Fl 2nd, Columbia, MO 65203. Isaac is Mango's registered agent with an address of 303 North Stadium Boulevard, 2nd Floor, Columbia, MO 65203. Mango's filings with the Missouri Secretary of State indicate that Isaac is the President, Secretary and Director of Mango. On its website at mangocapitals.com, Mango holds itself out as a provider of business loans offering two flexible financing options.

6.    This Bankruptcy Court has jurisdiction to hear and determine this adversary proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H) & (O). Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1409 in that the claims asserted herein arise in, arise under, or are related to the case Bankruptcy Case, which is pending under title 11 of the United States Code (the "Bankruptcy Code").

7.    This is an adversary proceeding to recover certain fraudulent transfers, to recover unauthorized post-petition transfers, and to recover damages from Waldron and Isaac for breaching their fiduciary duty to YTG.

---

[1]    On information and belief, Isaac previously used addresses at 330 Wyndham Dr., Cresco, PA, 18326 and 1767 Crestview Dr., Clarksville, TN 37042.

## FACTUAL BACKGROUND

### I.    The Corporate Formation.

8.    On January 28, 2021 (the "Petition Date"), YTG filed a voluntary petition for relief under Chapter 11 and elected subchapter V of the United States Bankruptcy Code, initiating the Bankruptcy Case in the Bankruptcy Court.

9.    YTG's bankruptcy papers were signed by Isaac in his capacity as Shareholder and Officer of YTG.

10.    Before the Petition Date and during the pendency of its Chapter 11 case, YTG operated as a trucking company with the use of a fleet of leased trucks.

11.    YTG was formed in North Carolina on November 7, 2019, pursuant to Articles of Incorporation signed by Nadeen Jahn as incorporator that were filed with the North Carolina Secretary of State ("SoS"), file number C201931001287.

12.    On or about March 5, 2020, a checking account in YTG's name was opened at a Wells Fargo Bank branch in Stroudsburg, PA, Account No. -9548 (the "YTG Bank Account"). On information and belief, neither Waldron nor Isaac lives in or near Stroudsburg, PA.

13.    Before the Petition Date, five business corporation annual reports were filed for YTG listing Ian Mullings ("Mullings"), Waldron, and Isaac as principals of YTG at various times as described below:

    a.    On June 9, 2020, an annual report was filed for the year ending 12/31/2019 listing Mullings, 303 N Stadium Blvd, Columbia, MO 65203 as president (SoS file number CA202016101744);

    b.    On June 9, 2020, an annual report was filed for the year ending 12/31/2020 indicating "changes" and listing Mullings, 301 McCullough Dr., Ste 400, Charlotte, NC 28262 as president (SoS file number CA202016102176);

    c.    On June 11, 2020, an annual report was filed for the year ending 12/31/2019 indicating "changes" and listing Mullings, 301 McCullough Dr., Ste 400,

3

Charlotte, NC 28262 as president (SoS file number CA202016301634);

d.    On September 14, 2020, an annual report was filed  for the year ending 12/31/2019 indicating "changes" and listing Mullings as president and Waldron as the chief executive officer (SoS file number CA202025800281); and

e.    On December 18, 2020, YTG filed an annual report for the year ended 12/31/2020 noting "changes" and listing Isaac as president of YTG in place of Mullings (SoS file number CA202035300446).

## II.    The Chapter 11 Bankruptcy Case.

14.    On February 19, 2021, the Bankruptcy Court entered its *Interim Order Granting Emergency Motion for Use of Cash Collateral* allowing YTG's use of cash collateral through February 26, 2021, pursuant to a weekly cash budget attached to that Order (the "First Budget"). (Doc. No. 48, pg. 11).

15.    On March 11, 2021, Isaac, appearing by telephone, testified under oath at the meeting of creditors in YTG's Chapter 11 bankruptcy case.  A copy of the transcript of that meeting is attached as **Exhibit A**.  Isaac testified that he was not familiar with Mullings' name or Waldron's name. Ex. A at 10-11. Isaac testified that he was the owner of YTG and had been since November 2019, having made a capital contribution of "maybe $1,500." *Id*. at 12, 20, 25. Isaac testified that an individual identified as Dani Levine handled YTG's business matters. *See*, *e.g*., *id*. at 8-9.

16.    Because Isaac was unable to provide responses to many of Bankruptcy Administrator's[2] questions about YTG's financial affairs, the March 11, 2021, creditors' meeting was continued to March 18, 2021 so that Dani Levine could testify on behalf of YTG. Ex. A at 25-27.

17.    On March 17, 2021, the Bankruptcy Administrator filed a motion to convert or

---

[2]    Shelley K. Abel is the United States Bankruptcy Administrator for the Western District of North Carolina.

dismiss the Chapter 11 case. (Doc. No. 72).

18.     On information and belief, Dani Levine refused to appear at a continued creditors'
meeting and be sworn, including the continued meeting of creditors on the March 18, 2021.

19.     The March 18, 2021 continued meeting of creditors was further continued to April
1, 2021. (Doc. No. 78).

20.     On March 11, 2021, the Bankruptcy Court entered its *Second Interim Order
Authorizing Debtor to Utilize Cash Collateral*, which permitted YTG to use cash collateral until
April 14, 2021, pursuant to a weekly budget attached to that Order for the period ending (the
"Second Budget"). (Doc. No. 64, pg. 4).

### III.    The Vehicle Leases.

21.     On September 14, 2020, acting on behalf of YTG, Waldron signed a lease
agreement (the "GM Lease") with Faulkner Chevrolet Cadillac, 298 Stoke Park Rd, PO Box 1368,
Bethlehem, PA, 18017, relative to a 2020 Cadillac Escalade, VIN 1GYS4KKJ7LR290942, which
was valued at the time of the agreement at $100,780.00 (the "GM Vehicle").  (*See* Claim No. 8-
1).[3] The GM Lease called for a down payment of $8,750.00, an initial payment of $1,569.21, and
38 monthly payments of $1,569.21 thereafter. (Claim No. 8-1, pg. 5). The GM Lease indicated
that YTG's address was 301 McCullough Dr, Ste 400, Charlotte, NC 28262 and that the GM
Vehicle would be garaged at 3477 Corporate Pkwy, Ste 100, Center Valley, PA 18034. (Claim 8-
1, pg. 5). On information and belief, Waldron guaranteed payment of the GM Lease.

22.     On information and belief, YTG has never maintained garage space at 3477
Corporate Pkwy, #100, Center Valley, PA 18034.

23.     As shown below, pre-petition transfers to GM Financial totaled $11,851.34 (the

---

[3]        References to "Claim No. ___" are to proofs of claim filed in the Claims Register for the Bankruptcy Case.

"Pre-Petition GM Lease Transfers") and a post-petition transfer of $1,569.21 was made (the "Post-Petition GM Lease Transfer") for a total of $13,420.55 (the "GM Lease Transfers"):

| Transfers to GM Financial | | | |
|---|---|---|---|
| Pre-Petition Transfers to GM Financial | | Post-Petition Transfers to GM Financial | |
| September 3, 2020 | $2,500.00 | February 26, 2021 | $1,569.21 |
| September 17, 2020 | $3,000.00 | | |
| October 28, 2020 | $1,596.46 | | |
| December 4, 2020 | $10.00 | | |
| December 4, 2020 | $1,569.21 | | |
| December 18, 2020 | $1,596.46 | | |
| January 26, 2021 | $1,579.21 | | |
| Total Pre-Petition Transfers | $11,851.34 | Total Post-Petition Transfers | $1,569.21 |
| Total Transfers to GM Financial | $13,420.55 | | |

24.    On September 18, 2020, acting on behalf of YTG, Waldron signed a lease agreement (the "BMW Lease") with Daniels BMW, 4600 Crackersport Rd, Allentown, PA 18104, relative to a 2021 BMW 840i xDrive Convertible, VIN WBADZ4Q0XMCF08863, which was valued at the time of that agreement at $106,945.00 (the "BMW Vehicle"). (*See* Claim No. 3-1). The BMW Lease called for a down payment of $2,500.00 followed by an initial monthly payment of $1,807.33, and 35 monthly payments of $1,807.33 thereafter. (Claim No. 3-1, Part 2, pg. 6). The BMW Lease lists YTG's address as 3477 Corporate Pkwy, #100, Center Valley, PA 18034. (Claim No. 3-1, Part 2, pg. 6). Waldron personally guaranteed YTG's obligations as to the BMW Lease. (Claim No. 3-1, Part 3, pg. 5).

25.    On information and belief, YTG has never maintained an office at 3477 Corporate Pkwy, #100, Center Valley, PA 18034.

26.    As shown below, pre-petition transfers to BMW Financial totaled $5,512.36 (the "Pre-Petition BMW Lease Transfers") and a post-petition transfer of $1,807.33 was made (the "Post-Petition BMW Lease Transfer") for a total of $7,319.69 (the "BMW Lease Transfers"), as follows:

| Transfers to BMW Financial | | | |
|---|---|---|---|
| Pre-Petition Transfers to BMW Financial | | Post-Petition Transfers to BMW Financial | |
| October 29, 2020 | $1,807.33 | March 1, 2021 | $1,807.33 |
| December 7, 2020 | $1,807.33 | | |
| December 30, 2020 | $1,897.70 | | |
| Total Pre-Petition Transfers | $5,512.36 | Total Post-Petition Transfers | $1,807.33 |
| Total Transfers to BMW Financial | $7,319.69 | | |

27.    Together, the Pre-Petition GM Lease Transfers and the Pre-Petition BMW Lease Transfers totaled $17,363.70 (the "Pre-Petition Auto Lease Transfers").

28.    Together, the Post-Petition GM Lease Transfer and the Post-Petition BMW Lease Transfer totaled $3,376.54 (the "Post-Petition Auto Lease Transfers").

29.    The First Budget did not provide authority for the Post-Petition Auto Lease Transfers.

30.    The Second Budget did not provide authority for the Post-Petition Auto Lease Transfers.

**IV.    Transfers to Mango Capital**.

31.    Before the Petition Date, between March 30, 2020, and November 17, 2020, YTG transferred a net amount of $369,738.85 to Mango (the "Mango Pre-Petition Transfers")[4] as set forth on the attached **Exhibit B**.

32.    After the Petition Date, YTG transferred a total of $41,228.68[5] to Mango (the "Mango Post-Petition Transfers") as follows:

---

[4]    Before the Petition Date, Mango transferred $55,800.00 to YTG and YTG transferred $425,538.85 to Mango resulting in net pre-petition transfers of $369,738.85.

[5]    There were no transfers from Mango to YTG after the Petition Date.

| Date of Transfer | Mode of Transfer | Amount |
|---|---|---|
| 1/29/2021 | Wire to Mango Account at M&T Bank | $4,500.00 |
| 2/23/2021 | Wire to Mango Account at M&T Bank | $3,000.00 |
| 2/25/2021 | Wire to Mango Account at M&T Bank | $4,800.00 |
| 3/8/2021 | Wire to Mango Account at M&T Bank | $9,600.00 |
| 3/12/2021 | Wire to Mango Account at M&T Bank | $3,968.68 |
| 3/12/2021 | Wire to Mango Account at M&T Bank | $4,800.00 |
| 3/19/2021 | Wire to Mango Account at M&T Bank | $5,280.00 |
| 3/26/2021 | Wire to Mango Account at M&T Bank | $5,280.00 |
| | **Total Post-Petition Transfers to Mango** | **$41,228.68** |

33.     The First Budget did not authorize YTG to make payments or transfers to Mango.

34.     The Second Budget did not authorize YTG to make payments or transfers to Mango.

**V.      The Chapter 7 Bankruptcy Case**.

35.     On March 30, 2021 (the "Conversion Date"), the Bankruptcy Court entered an Order converting YTG's case to chapter 7 and appointing Plaintiff as the Trustee to administer the Bankruptcy Case. (Doc. No. 98).

36.     YTG ceased operations no later than the Conversion Date.

37.     On April 12, 2021, a document captioned as a "Complaint to the US Bankruptcy Court and US Trustees Office" was docketed in the Bankruptcy Case (the "First Complaint"). (Doc. No. 117). The signature line on the First Complaint indicated that it was signed by YTG rather than an attorney. (Doc. No. 117, pg. 5).

38.     On information and belief, Isaac caused the First Complaint to be filed. The First Complaint argued, among other things, that YTG's bankruptcy attorneys failed to properly disclose payments received by their firm, Essex Richards, PA.[6] (*Id*.).

39.     On April 15, 2021, a letter from Isaac was filed in the Bankruptcy Case (the

---

[6]     Essex Richards, P.A. (the "Essex Firm") represented YTG in filing the Bankruptcy Case but was permitted to withdraw from that representation pursuant to an Order entered on May 27, 2021. (Doc. No. 175).

"Second Complaint"). (Doc. No. 123). The Second Complaint included among its attachments redacted copies of bank statements for the period of March 10, 2020, through July 31, 2021, for an account held in Mango's name ending in -1633 at M&T Bank in Stroudsburg, PA (the "Mango Account"). (Doc. No. 123, pgs. 16-26). Also attached to the Second Complaint were copies of invoices from Ryder Transportation Services ("Ryder") for truck rental, gas, and other expenses. (Doc. No. 123, pgs. 16-26 and 47-50; Doc. No. 123-1, pgs. 1-58; Doc. 123-2, pgs. 1-60). The Second Complaint argued that funds were transferred from YTG to Mango so that Mango could pay Ryder's invoices for YTG's benefit. (Doc. No. 123, pg. 2). The Second Complaint did not include documentation of an agreement between YTG and Mango relative to payments to Ryder or any other business relationship. (*See* Doc. No. 123).

40.     Ryder is not identified as a creditor of YTG in the Bankruptcy Case. Mango is not identified as a creditor of YTG in the Bankruptcy Case.

41.     The Second Complaint included a copy of an email from "Dani Levine-Yellowstone Transportation Group dani@yellowstonetransportationgroup.com" dated April 8, 2021 and addressed to customerservice@conflictsolutionsllc.com and Isaac. (Doc. No. 123, pg. 31-32). Dani Levine was identified in the signature block on that email as the "Consultant" for YTG. (Doc. No. 123, pg. 32). Dani Levine also has an email address of dani@mangocapitals.com.[7] (Doc. No. 46-3, Ex. C, pg. 1). Visitors to mangocapitals.com are greeted with an invitation to a live chat with a support agent, dani@mangocapitals.com. *See* mangocapitals.com (last visited on 7/15/2021).

42.     On April 23, 2021, in a conversation with the Trustee, Waldron stated that she

---

[7]     In a complaint filed by Ryder Truck Rental, Inc. against Mango in the U.S. District Court for the Southern District of Florida, Dani Levine is identified in attached correspondence as "VP Business Development" for Mango. *Ryder Truck Rental, Inc. v. Mango Capital, Inc.*, Case No. Case No. 1-20-cv-24071-DLG, Doc. No. 1 at 14.

believed that Isaac had possession of the BMW Vehicle, but she had never met Isaac.

43.     On May 3, 2021, the Bankruptcy Court entered an Order granting the Trustee's motion to reject the BMW Lease and to abandon any interest that the bankruptcy estate had in the BMW Vehicle. (Doc. No. 146).

44.     On May 5, 2021, the Trustee convened the telephonic meeting of creditors in YTG's chapter 7 case. No representative of YTG called in for that creditors' meeting.

45.     Thereafter, the Trustee received an invoice from Tolls By Mail for the Port Authority of New Jersey relative to a vehicle with a Pennsylvania license plate number LKT3931 that triggered a toll at the Holland Tunnel between New York and New Jersey on April 10, 2021, eleven days after the Conversion Date. An internet search revealed that the license plate shown on the Tolls By Mail invoice is the tag for the GM Vehicle.

46.     The Bankruptcy Court did not authorize any party to use the GM Vehicle after the Conversion Date.

47.     On May 14, 2021, the Bankruptcy Court entered an Order allowing the Trustee's motion to reject the GM Lease and to abandon any interest that the bankruptcy estate had in the GM Vehicle. (Doc. No. 165).

**VI.    Dani Levine and Carleen Maynor**.

48.     The only authorized signer on the YTG Bank Account was an individual named as Carleen Maynor ("Maynor") with an address of 330 Wyndham Dr., Cresco, PA 18326.

49.     Maynor[8] is the debtor in a chapter 13 bankruptcy case currently pending before the U.S. Bankruptcy Court for the Middle District of Pennsylvania, Case No. 5-19-bk-01701 (the "Maynor Bankruptcy Case"). The address for the debtor in the Maynor Bankruptcy Case is listed

---

[8]     The petition in the Maynor Bankruptcy Case indicates that Maynor is also known as Carleen Greenidge and Carleen Greenidge-Maynor.

as 330 Wyndham Dr., Cresco, PA 18326. (Case No. 19-bk-01701, Bankr. M.D.P.A., Doc. No. 1,

pg. 2). The debtor in the Maynor Bankruptcy Case represented as her occupation on Schedule I:

"V.P. of Business Development" for "Mango Capital, New York, NY." (Case No. 19-bk-01701,

Bankr. M.D.P.A., Doc. No. 1, pg. 44). The United States Department of Justice – New Jersey holds

an unsecured priority claim against Maynor for criminal restitution in the amount of $232,402.00.

(Case No. 19-bk-01701, Bankr. M.D.P.A., Doc. No. 1, pg. 21).

50.     In past years, Maynor has been involved with bankruptcy cases for other trucking

and moving companies.[9]

51.     YTG's filings with the North Carolina Secretary of State do not identify Maynor as

an officer, director, or shareholder of YTG. Maynor is not identified in YTG's bankruptcy papers

as a principal, an officer, an employee, or a creditor of YTG. Maynor is not identified in the

communications between Isaac, Dani Levine, and YTG's bankruptcy counsel at the Essex Firm.

Maynor is not identified in the communications between Isaac, Dani Levine, and YTG's attorneys

at Poyner Spruill, who represented YTG before the Petition Date.[10]

52.     According to https://carleengreenidge.com/about,[11] Maynor is the founder of

Mango and its owner as well as the owner of YTG and Road Scholar Staffing.[12] **Exhibit C.**

53.     On information and belief, Maynor controls the Mango Account at M&T Bank in

---

[9]     *See, e.g.*, *In re United Distribution, Inc.*, Case No. 12-12501 (Bankr. D.DE); *In re Ultimate Management, LLC*, Case No. 5:15-bk-03150 (Bankr. M.D.P.A.).

[10]    On December 22, 2020, Poyner Spruill sent an engagement letter to Dani Levine as VP-Operations for YTG confirming that firm's agreement to represent YTG in connection with demand letters YTG had received from Penske Truck Leasing Co., L.P.

[11]    *See*, https://carleengreenidge.com (last visited on 7/21/2021).

[12]    Road Scholar Staffing ("RSS") is a Tennessee company that holds itself out as "a reliable provider of truck driver recruitments solutions to the commercial industry." Road Scholar Staffing, https://roadscholarstaffing.com (last visited 7/14/2021). RSS was not listed as a creditor of YTG's but was referenced in YTG's Scheduled G as "Rhoades Scholar Staffing." (Doc. No. 50, pg. 17). No transfers to RSS were listed in YTG's Statement of Financial Affairs, which only referenced an attached spreadsheet that was not attached. (Doc. No. 49, pg. 1). On information and belief, YTG recruited and paid truck drivers through RSS.

Stroudsburg, PA.

54.     On information and belief, Maynor uses the name Dani Levine as an alias.

55.     Regular debits for an E-ZPass account in Maynor's name were made from the YTG

Bank Account.

56.     Regular payments due from Maynor to AT&T, Verizon, and Highmark Electronic

Data Interchange were deducted from the YTG Bank Account, which, on information and belief,

were not made for YTG's benefit.

57.     Maynor signed to withdraw funds from the YTG Bank Account to purchase

cashier's checks as follows (the "Cashier's Checks"):

a.      Withdrawal of $6,010.00 on May 16, 2020 for a check to Garces Dental
        Group[13] for $6,000.00 on May 16, 2020;
b.      Withdrawal of $33,385.00 on August 8, 2020 relative to a check for
        $24,855.00 to Strand Finance Company, a check for $7,650.00 to Condor
        Valley Corporation, and a check for $850.00 to the Garces Foundation.[14]

58.     The "Purchaser" on each of the Cashier's Checks is identified as Carleen Maynor.

On information and belief, none of the Cashier's Checks were issued to creditors of YTG or

otherwise used for a business purpose for YTG.

59.     Maynor made in-person withdrawals of cash from the YTG Bank Account as

follows (the "Withdrawals"):

a.      Withdrawal of $1,000.00 on April 2, 2020;
b.      Withdrawal of $5,000.00 on May 9, 2020, that was posted on May 11, 2020,
        in the following denominations: 8-$100 bills, 140-$20.00 bills, and 140-
        $10.00 bills;
c.      Withdrawal of $2,500.00 on May 22, 2020;
d.      Withdrawal of $1,500.00 on May 28, 2020;

---

[13]     According to www.garcesdentalgroup.com, the recipient of this transfer is a dental practice located at 212
Race Street, Suite 1A, Philadelphia, PA, 19106.
[14]     According to its website, the recipient of this transfer is located at 1901 South 9th Street, Philadelphia, PA
19148, and the entity is "a community-based, non-profit organization committed to providing Philadelphia's
immigrant population the healthcare, education, and support to empower them to fulfill their potential as citizens and
enjoy the highest possible quality of life." *See* Garces Foundation, https://garcesfoundation.org (last visited on
7/12/2021).

e.    Withdrawal of $500.00 on May 29, 2020; and

f.    Withdrawal of $4,000.00 on June 16, 2020.

60.    A debit card ending in -8051 (the "Debit Card") was used at ATM machines to withdraw cash from the YTG Bank Account totaling not less than $30,625.00 (the "ATM Withdrawals").

61.    On information and belief, none of the Withdrawals or ATM Withdrawals were made for a business purpose of YTG.

62.    Before the Petition Date, there were numerous charges on the Debit Card at businesses in the area around Cresco, Stroudsburg, and Mount Pocono, PA for purchases including, but not limited to, furniture, home repairs, household goods, household expenses, groceries, pet care, restaurant meals, and personal care expenses.

63.    Before the Petition Date, the Debit Card was used to transfer funds to retail establishments including, but not limited to, hotels, airlines, liquor stores, fast food outlets, and restaurants that, on information and belief, were not used for YTG's business purposes.

64.    Before the Petition Date, YTG's funds were transferred to certain individuals including, by way of example but not limitation, the following:

a.    Transfer on 4/8/2020 of $1,000.00 to Justin Conlon Law[15] in Connecticut;

b.    Transfers on 10/23/2020 and 11/15/2020 to Timothy A. McNeal Sr.[16] for $651.03 each;

c.    Multiple transfers to Nicole Parke[17] in June, July, August, October, and November 2020 totaling $4,450.00, and one post-petition transfer in February 2021 for $140.00;

d.    Multiple transfers to Gabriel Osei Acheampong[18] in July, October, November and December 2020, and January 2021 totaling $11,210.00;[19] and

---

[15]    Plaintiff is informed and believes that this firm has represented Maynor on immigration matters.

[16]    On information and belief, Timothy A. McNeal Sr. is Waldron's spouse.

[17]    On information and belief, Nicole Parke is Maynor's sister.

[18]    On information and belief, Gabriel Osei Acheampong is Maynor's nephew.

[19]    This figure does not include Cash App transfers to "*Gabriel" made in October and November 2020 totaling $575.00.

e.     Transfers to Dillett Delancy in October and December 2020 totaling $12,500.00.

65.     Before the Petition Date, YTG's funds totaling not less than $32,366.15were transferred outside the United States via WorldRemit.

66.     Before the Petition Date, YTG funds were used for numerous online purchases of clothing and luxury goods, for fitness programs, and for charitable contributions.

67.     On information and belief, the pre-petition transfers and withdrawals from the YTG Bank Account for items other than the normal operating expenses of YTG totaled approximately $391,000.00 (the "Pre-Petition Non-Business Transfers").

68.     After the Petition Date, YTG's funds were used for various personal expenses, fast food, airline expenses, and similar purchases. On information and belief, the post-petition transfers and withdrawals from the YTG Bank Account for items other than the normal operating expenses of YTG totaled approximately $3,100.00 (the "Post-Petition Non-Business Transfers").

69.     On information and belief, Waldron and Isaac had knowledge that Maynor exercised control over the YTG Bank Account and used YTG's funds for the Pre-Petition Non-Business Transfers and Post-Petition Non-Business Transfers.

70.     On information and belief, the Pre-Petition Non-Business Transfers and Post-Petition Non-Business Transfers from the YTG Bank Account were made with the consent of Waldron or Isaac or both.

71.     Neither Waldron nor Isaac exercised appropriate oversight over the use of YTG's funds.

**FIRST CAUSE OF ACTION**
**Fraudulent Transfer – Pre-Petition Transfers – Pre-Petition Auto Lease Transfers**
**11 U.S.C. § 548**
**Against Waldron and Isaac**

72.     Plaintiff hereby realleges and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

73.     Before the Petition Date, YTG made the Pre-Petition Auto Lease Transfers totaling $17,363.70 in connection with the BMW Lease and the GM Lease.

74.     Waldron was an insider of YTG when the GM Lease was executed.

75.     Waldron's execution of the GM Lease was not done in the ordinary course of YTG's business.

76.     The GM Vehicle was not used in YTG's business operations.

77.     On information and belief, the GM Vehicle was in the possession of Waldron or Isaac before the Petition Date. Alternatively, on information and belief, Waldron or Isaac consented to a third party's possession and use of the GM Vehicle before the Petition Date.

78.     To the extent that Waldron or Isaac maintained possession and use of the GM Vehicle, Pre-Petition Auto Lease Transfers relative to the GM Lease were made for the benefit of Waldron or Isaac.

79.     Waldron was an insider of YTG when the BMW Lease was executed.

80.     Waldron's execution of the BMW Lease was not done in the ordinary course of YTG's business.

81.     The BMW Vehicle was not used in YTG's business operations.

82.     On information and belief, the BMW Vehicle was in the possession of Waldron or Isaac before the Petition Date. Alternatively, on information and belief, Waldron or Isaac consented to a third party's possession and use of the BMW Vehicle before the Petition Date.

15

83.     To the extent that Waldron or Isaac maintained possession and use of the BMW Vehicle, Pre-Petition Auto Lease Transfers relative to the BMW Lease were made for the benefit of Waldron or Isaac.

84.     Waldron's guaranty obligations with respect to the BMW Lease and the GM Lease were reduced by the Pre-Petition Auto Lease Transfers made by YTG.

85.     On information and belief, the Pre-Petition Auto Lease Transfers were made while YTG was insolvent or YTG became insolvent as a result of the Pre-Petition Auto Lease Transfers.

86.     In the alternative, on information and belief, when the Pre-Petition Auto Lease Transfers were made, YTG was engaged in or was about to engage in business or a transaction for which any property remaining with YTG was unreasonably small capital.

87.     In the alternative, on information and belief, when the Pre-Petition Auto Lease Transfers were made, YTG intended to incur or YTG believed that it would incur debts that would be beyond YTG's ability to pay as such debts matured.

88.     In the alternative, on information and belief, the Pre-Petition Auto Lease Transfers were made to or for the benefit of an insider or incurred to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

89.     YTG received less than reasonable equivalent value for the Auto Lease Transfers.

90.     The Pre-Petition Auto Lease Transfers to or for the benefit of Waldron or Isaac are avoidable as fraudulent conveyances pursuant to 11 U.S.C. § 548.

91.     To the extent that the Pre-Petition Auto Lease Transfers are avoidable, Plaintiff may recover the value of the same from Waldron as an immediate or mediate transferee 11 U.S.C. § 550(a)(2).

92.     To the extent that the Pre-Petition Auto Lease Transfers are avoidable, Plaintiff

may recover the value of the same from Isaac as an immediate or mediate transferee 11 U.S.C. § 550(a)(2).

93.     Plaintiff prays that the Bankruptcy Court will enter an Order pursuant to 11 U.S.C. § 548 holding that Waldron and/or Isaac are liable to the bankruptcy estate for the Pre-Petition Auto Lease Transfers in the amount of $17,363.70.

### SECOND CAUSE OF ACTION
**Fraudulent Transfer – Pre-Petition Auto Lease Transfers**
**11 U.S.C. § 544(b) & N.C. Gen. Stat. § 39-23.5**
**Against Waldron and Isaac**

94.     Plaintiff hereby realleges and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

95.     Pilot Flying J Fleet and Penske Truck Leasing Co., L.P. are general unsecured creditors of YTG's estate holding allowable claims under 11 U.S.C. § 502 and were creditors at the time that the Pre-Petition Auto Lease Transfers were made. The Pre-Petition Auto Lease Transfers are avoidable by said creditors pursuant to N.C. Gen. Stat. § 39-23.5.

96.     Waldron was an insider of YTG on the date that she bound YTG to the GM Lease.

97.     YTG did not use the GM Vehicle in its business operations.

98.     YTG did not receive reasonably equivalent value for the Pre-Petition Auto Lease Transfers with respect to the GM Lease.

99.     Waldron was an insider of YTG on the date that she bound YTG to the BMW Lease.

100.    YTG did not use the BMW Vehicle in its business operations.

101.    YTG did not receive reasonably equivalent value for the Pre-Petition Auto Lease Transfers with respect to the BMW Lease.

102.    When the Pre-Petition Auto Lease Transfers were made, YTG was engaged or was about to engage in a business or a transaction for which the remaining assets of YTG were

17

unreasonably small in relation to the business or transaction or YTG intended to incur, or believed that it would incur, debts beyond YTG's ability to pay as they became due.

103.   YTG was insolvent when the Pre-Petition Auto Lease Transfers were made or became insolvent shortly thereafter.

104.   The Pre-Petition Auto Lease Transfers with respect to the GM Vehicle reduced Waldron's liability as guarantor of the GM Lease.

105.   The Pre-Petition Auto Lease Transfers with respect to the BMW Vehicle reduced Waldron's liability as guarantor of the BMW Lease.

106.   To the extent that Isaac had possession and use of the GM Vehicle, the Pre-Petition Auto Lease Transfers with respect to the GM Lease were made for his benefit.

107.   To the extent that Isaac had possession and use of the BMW Vehicle, the Pre-Petition Auto Lease Transfers with respect to the BMW Lease were made for his benefit.

108.   To the extent that the Pre-Petition Auto Lease Transfers are avoidable as fraudulent conveyances pursuant to N.C. Gen. Stat. § 39-23.5, the same are avoidable pursuant to 11 U.S.C. § 544(b).

109.   To the extent that the Pre-Petition Auto Lease Transfers are avoidable, Plaintiff may recover the value of the same from Waldron as an immediate or mediate transferee pursuant to 11 U.S.C. § 550(a)(2).

110.   To the extent that the Pre-Petition Auto Lease Transfers are avoidable, Plaintiff may recover the value of the same from Isaac as an immediate or mediate transferee pursuant to 11 U.S.C. § 550(a)(2).

111.   Plaintiff prays that the Bankruptcy Court will enter an Order pursuant to 11 U.S.C. § 544(b) & N.C. Gen. Stat. § 39-23.5 holding that Waldron and/or Isaac are liable to the bankruptcy

estate for the Pre-Petition Auto Lease Transfers in the amount of $17,363.70.

### THIRD CAUSE OF ACTION
**Fraudulent Conveyance – Pre-Petition Auto Lease Transfers**
**11 U.S.C. § 544(b) and N.C. Gen. Stat. § 39-23.4**
**Against Waldron and Isaac**

112.    Plaintiff hereby realleges and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

113.    On information and belief, YTG did not receive reasonably equivalent value for the Pre-Petition Auto Lease Transfers, and YTG was engaged or about to be engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction, and, as a result, the Pre-Petition Auto Lease Transfers were fraudulent as to present and future creditors pursuant to N.C. Gen. Stat. § 39-23.4.

114.    In the alternative, on information and belief, YTG intended to incur or believed that it would incur debts beyond its ability to pay as they became due and, as a result, the Pre-Petition Auto Lease Transfers were fraudulent as to present and future creditors pursuant to N.C. Gen. Stat. § 39-23.4.

115.    YTG did not use the BMW Vehicle and the GM Vehicle in its business operations.

116.    YTG did not receive reasonably equivalent value for the Pre-Petition Auto Lease Transfers.

117.    Following the Pre-Petition Auto Lease Transfers, YTG's remaining assets were not sufficient to meet YTG's financial obligations.

118.    Following the Pre-Petition Auto Lease Transfers, YTG believed it would incur or intended to incur debts that it could not pay.

119.    The Pre-Petition Auto Lease Transfers were made for Waldron's benefit because they reduced Waldron's liability as guarantor of the BMW Lease and the GM Lease.

120.    To the extent that Isaac had possession and use of the BMW Vehicle, the Pre-Petition Auto Lease Transfers with respect to the BMW Lease were made for his benefit.

121.    To the extent that Isaac had possession and use of the GM Vehicle, the Pre-Petition Auto Lease Transfers with respect to the GM Lease were made for his benefit.

122.    To the extent that the Pre-Petition Auto Lease Transfers are avoidable as fraudulent conveyances pursuant to N.C. Gen. Stat. § 39-23.4, the same are avoidable pursuant to 11 U.S.C. § 544(b).

123.    To the extent that the Pre-Petition Auto Lease Transfers are avoidable, Plaintiff may recover the value of the same from Waldron as an immediate or mediate transferee pursuant to 11 U.S.C. § 550(a)(2).

124.    To the extent that the Pre-Petition Auto Lease Transfers are avoidable, Plaintiff may recover the value of the same from Isaac as an immediate or mediate transferee pursuant to 11 U.S.C. § 550(a)(2).

125.    Plaintiff prays that the Bankruptcy Court will enter an Order pursuant to 11 U.S.C. § 544(b) and N.C. Gen. Stat. § 39-23.4 holding that Waldron and/or Isaac are liable to the bankruptcy estate for the Pre-Petition Auto Lease Transfers in the amount of $17,363.70.

## FOURTH CAUSE OF ACTION
**Unauthorized Post-petition Transactions – Post-Petition Auto Lease Transfers**
**11 U.S.C. § 549**
**Against Waldron and Isaac**

126.    Plaintiff hereby realleges and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

127.    The Post-Petition Auto Lease Transfers were made after the Petition Date.

128.    The Post-Petition Auto Lease Transfers were not authorized by the First Budget, or any order entered by the Bankruptcy Court.

129.     The Post-Petition Auto Lease Transfers were not authorized by the Second Budget, or any order entered by the Bankruptcy Court.

130.     The Post-Petition Auto Lease Transfers reduced Waldron's liability on her personal guaranties of the BMW Lease and the GM Lease.

131.     The Post-Petition Auto Lease Transfers were made for the benefit of Waldron.

132.     To the extent that Isaac had possession and use of the BMW Vehicle, the Post-Petition Auto Lease Transfers with respect to the BMW Lease were made for his benefit.

133.     To the extent that Isaac had possession and use of the GM Vehicle, the Post-Petition Auto Lease Transfers with respect to the GM Lease were made for his benefit.

134.     To the extent that the Post-Petition Auto Lease Transfers are avoidable as unauthorized post-petition transactions, pursuant to 11 U.S.C. § 549(a), Plaintiff may recover the value of the same from Waldron as an immediate or mediate transferee pursuant to 11 U.S.C. § 550(a)(2).

135.     To the extent that the Post-Petition Auto Lease Transfers are avoidable as unauthorized post-petition transactions, pursuant to 11 U.S.C. § 549(a), Plaintiff may recover the value of the same from Isaac as an immediate or mediate transferee pursuant to 11 U.S.C. § 550(a)(2).

136.     Plaintiff prays that the Bankruptcy Court will enter an Order pursuant to 11 U.S.C. § 549 holding that Waldron and/or Isaac are liable to the bankruptcy estate for Post-Petition Auto Lease Transfers in the amount of $3,376.54.

**FIFTH CAUSE OF ACTION**
**Fraudulent Transfer – Mango Pre-Petition Transfers**
**11 U.S.C. § 548**
**Against Mango**

137.     Plaintiff hereby realleges and incorporates by reference each and every allegation

contained in the preceding paragraphs of this Complaint.

138.    Before the Petition Date, YTG made the Mango Pre-Petition Transfers for a net amount of $369,738.85.

139.    On information and belief, the Mango Pre-Petition Transfers were not made in the ordinary course of YTG's business operations.

140.    Isaac was an insider of YTG and an insider of Mango when the Mango Pre-Petition Transfers were made.

141.    On information and belief, the Mango Pre-Petition Transfers were made while YTG was insolvent or YTG became insolvent as a result of the Mango Pre-Petition Transfers.

142.    In the alternative, on information and belief, the Mango Pre-Petition Transfers were made while YTG was engaged in or was about to engage in business or a transaction for which any property remaining with YTG was unreasonably small capital.

143.    In the alternative, on information and belief, when the Mango Pre-Petition Transfers were made, YTG intended to incur or YTG believed that it would incur debts that would be beyond YTG's ability to pay as such debts matured.

144.    In the alternative, on information and belief, the Mango Pre-Petition Transfers were made to or for the benefit of an insider or incurred to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

145.    YTG received less than reasonable equivalent value for the Mango Pre-Petition Transfers.

146.    The Mango Pre-Petition Transfers to or for the benefit of Isaac are avoidable as fraudulent conveyances pursuant to 11 U.S.C. § 548.

147.    To the extent that the Mango Pre-Petition Transfers are avoidable, Plaintiff may

recover the value of the same from Mango as an immediate or mediate transferee 11 U.S.C. § 550(a)(2).

148.    Plaintiff prays that the Bankruptcy Court will enter an Order pursuant to 11 U.S.C. § 548 holding that Mango is liable to the bankruptcy estate for the Mango Pre-Petition Transfers in the amount of $369,738.85.

**SIXTH CAUSE OF ACTION**
**Fraudulent Transfer – Mango Pre-Petition Transfers**
**11 U.S.C. § 544(b) & N.C. Gen. Stat. § 39-23.5**
**Against Mango**

149.    Plaintiff hereby realleges and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

150.    Pilot Flying J Fleet and Penske Truck Leasing Co., L.P. are general unsecured creditors of YTG's estate holding allowable claims under 11 U.S.C. § 502 and were creditors at the time that the Mango Pre-Petition Transfers were made. The Mango Pre-Petition Transfers are avoidable by said creditors pursuant to N.C. Gen. Stat. § 39-23.5.

151.    YTG did not receive reasonably equivalent value for the Mango Pre-Petition Transfers.

152.    When the Mango Pre-Petition Transfers were made, YTG was engaged or was about to engage in a business or a transaction for which the remaining assets of YTG were unreasonably small in relation to the business or transaction or YTG intended to incur, or believed that it would incur, debts beyond YTG's ability to pay as they became due.

153.    YTG was insolvent when the Mango Pre-Petition Transfers were made or became insolvent shortly thereafter.

154.    To the extent that the Mango Pre-Petition Transfers are avoidable as fraudulent conveyances pursuant to N.C. Gen. Stat. § 39-23.5, the same are avoidable pursuant to 11 U.S.C.

§ 544(b).

155.    To the extent that the Mango Pre-Petition Transfers are avoidable, Plaintiff may

recover the value of the same from Mango as an immediate or mediate transferee pursuant to 11

U.S.C. § 550(a)(2).

156.    Plaintiff prays that the Bankruptcy Court will enter an Order pursuant to 11 U.S.C.

§ 544(b) & N.C. Gen. Stat. § 39-23.5 holding that Mango is liable to the bankruptcy estate for the

Mango Pre-Petition Transfers in the amount of $369,738.85.

**SEVENTH CAUSE OF ACTION**
**Fraudulent Transfer – Mango Pre-Petition Transfers**
**11 U.S.C. § 544(b) & N.C. Gen. Stat. § 39-23.4**
**Against Mango**

157.    Plaintiff hereby realleges and incorporates by reference each and every allegation

contained in the preceding paragraphs of this Complaint.

158.    On information and belief, YTG did not receive reasonably equivalent value for the

Mango Pre-Petition Transfers, and YTG was engaged or about to be engaged in a business or

transaction for which its remaining assets were unreasonably small in relation to the business or

transaction and, as a result, the Mango Pre-Petition Transfers were fraudulent as to present and

future creditors pursuant to N.C. Gen. Stat. § 39-23.4.

159.    In the alternative, on information and belief, YTG intended to incur or believed that

it would incur debts beyond its ability to pay as they became due and, as a result, the Mango Pre-

Petition Transfers were fraudulent as to present and future creditors pursuant to N.C. Gen. Stat. §

39-23.4.

160.    Following the Mango Pre-Petition Transfers, YTG's remaining assets were not

sufficient to meet YTG's financial obligations.

161.    Following the Mango Pre-Petition Transfers, YTG believed it would incur or

24

intended to incur debts that it could not pay.

162.    To the extent that the Mango Pre-Petition Transfers are avoidable as fraudulent conveyances pursuant to N.C. Gen. Stat. § 39-23.4, the same are avoidable pursuant to 11 U.S.C. § 544(b).

163.    To the extent that the Mango Pre-Petition Transfers are avoidable, Plaintiff may recover the value of the same from Mango as an immediate or mediate transferee pursuant to 11 U.S.C. § 550(a)(2).

164.    Plaintiff prays that the Bankruptcy Court will enter an Order pursuant to 11 U.S.C. § 544(b) and N.C. Gen. Stat. § 39-23.4 holding that Mango is liable to the bankruptcy estate for the Mango Pre-Petition Transfers in the amount of $369,738.85.

**EIGHTH CAUSE OF ACTION**
**Unauthorized Post-Petition Transfers – Mango Post-Petition Transfers**
**11 U.S.C. § 549**
**Against Mango**

165.    Plaintiff hereby realleges and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

166.    The Mango Post-Petition Transfers were made after the Petition Date.

167.    The Mango Post-Petition Transfers were not authorized by the First Budget, or any order entered by the Bankruptcy Court.

168.    The Mango Post-Petition Transfers were not authorized by the Second Budget, or any order entered by the Bankruptcy Court.

169.    To the extent that the Mango Post-Petition Transfers are avoidable as unauthorized post-petition transactions, Plaintiff may recover the value of the same from Mango as an immediate or mediate transferee pursuant to 11 U.S.C. § 550(a)(2).

170.    Plaintiff prays that the Bankruptcy Court will enter an Order pursuant to 11 U.S.C.

§ 549 holding that Mango is liable to the bankruptcy estate for Mango Post-Petition Transfers in the amount of $41,228.68.

### NINTH CAUSE OF ACTION
**Breach of Fiduciary Duty – N.C. Gen. Stat. § 55-8-42**
**Against Waldron**

171.    Plaintiff hereby realleges and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

172.    In North Carolina, officers of a corporation shall discharge their duties in good faith, with the care of an ordinarily prudent person in a like position under similar circumstances, and in a manner reasonably believed to be in the best interests of the corporation.

173.    As CEO of YTG, Waldron had a duty to YTG to act in a manner that she reasonably believed to be in the best interests of YTG and to refrain from self-dealing transactions.

174.    As CEO of YTG, Waldron was required to act in good faith and with due care and was not permitted to use her position of trust to further her own private interests.

175.    On information and belief, Waldron had knowledge that Maynor exercised control over the YTG Bank Account.

176.    On information and belief, Waldron consented to Maynor's use of the YTG Bank Account fund for Maynor's personal purposes.

177.    Waldron breached her fiduciary duty to YTG by failing to exercise appropriate oversight and control of the YTG Bank Account such that Maynor was empowered to make the Pre-Petition Non-Business Transfers and the Post-Petition Non-Business Transfers.

178.    Plaintiff prays that the Bankruptcy Court will enter an Order pursuant to N.C. Gen. Stat. § 55-8-42 holding that Waldron is liable to the bankruptcy estate for breaching her fiduciary duty to YTG and awarding damages to the bankruptcy estate in an amount of not less than

$394,100.00 reflecting the sum of the Pre-Petition Non-Business Transfers of not less than $391,000.00 and Post-Petition Non-Business Transfers of $3,100.00.

## **TENTH CAUSE OF ACTION**

### **Breach of Fiduciary Duty – N.C. Gen. Stat. § 55-8-42**
### **Against Isaac**

179.    Plaintiff hereby realleges and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

180.    In North Carolina, officers of a corporation shall discharge their duties in good faith, with the care of an ordinarily prudent person in a like position under similar circumstances, and in a manner reasonably believed to be in the best interests of the corporation.

181.    As Officer and President of YTG, Isaac had a duty to YTG to act in a manner that he reasonably believed to be in the best interests of YTG and to refrain from self-dealing transactions.

182.    As Officer and President of YTG, Isaac was required to act in good faith and with due care and was not permitted to use his position of trust to further his own private interests.

183.    As the owner of YTG and the owner of Mango, Isaac had a conflict of interest with respect to transfers between YTG and Mango.

184.    As Officer and President of YTG and President and Secretary of Mango, Isaac had a conflict of interest with respect to transfers between YTG and Mango.

185.    On information and belief, Isaac had knowledge that Maynor exercised control over the YTG Bank Account.

186.    On information and belief, Isaac had knowledge that Maynor exercised control over the Mango Account to which YTG's funds were transferred.

187.    On information and belief, Isaac acted in concert with Maynor with respect to the

Mango Pre-Petition Transfers and the Mango Post-Petition Transfers.

188.    Isaac breached his fiduciary duty as President of YTG by failing to exercise appropriate oversight and control of the YTG Bank Account such that Maynor was empowered to make the Mango Pre-Petition Transfers and the Mango Post-Petition Transfers.

190.    On information and belief, Isaac breached his fiduciary duty to YTG by causing or consenting to the transfers of YTG's funds reflected in the Mango Pre-Petition Transfers and the Mango Post-Petition Transfers.

191.    Isaac breached his fiduciary duty as Officer and President of YTG by failing to exercise appropriate oversight and control of the YTG Bank Account such that Maynor was empowered to make the Pre-Petition Non-Business Transfers and Post-Petition Non-Business Transfers.

192.    Plaintiff prays that the Bankruptcy Court will enter an Order pursuant to N.C. Gen. Stat. § 55-8-42 holding that Isaac is liable to the bankruptcy estate for breaching his fiduciary duty to YTG and awarding damages in an amount of not less than $805,067.53 reflecting the total amount of the Mango Pre-Petition Transfers ($369,738.85), the Mango Post-Petition Transfers ($41,228.68), the Pre-Petition Non-Business Transfers ($391,000.00), and the Post-Petition Non-Business Transfers ($3,100.00).

WHEREFORE, Plaintiff prays that the Court will enter an Order granting the following relief:

A.      As to the First Cause of Action, entry of an order granting judgment for Plaintiff pursuant to 11 U.S.C. § 548 and requiring Waldron and/or Isaac to turn over to Plaintiff the value of the Auto Lease Transfers, $17,363.70, pursuant to11 U.S.C. § 550(a);

B.      As to the Second Cause of Action, entry of an order granting judgment for Plaintiff pursuant to 11 U.S.C. § 544(b) and N.C. Gen. Stat. § 39-23.5 and requiring Waldron and/or Isaac to turn over to Plaintiff the value of the Auto Lease Transfers, $17,363.70, pursuant to 11 U.S.C. § 550(a);

C.      As to the Third Cause of Action, entry of an order granting judgment for Plaintiff pursuant to 11 U.S.C. § 544(b) and N.C. Gen. Stat. § 39-23.4 and requiring Waldron and/or Isaac to turn over to Plaintiff the value of the Auto Lease Transfers, $17,363.70, pursuant to 11 U.S.C. § 550(a);

D.      As to the Fourth Cause of Action, entry of an order granting judgment for Plaintiff pursuant to 11 U.S.C. § 549 and requiring Waldron and/or Isaac to turn over to Plaintiff the value of the Post-Petition Transfers, $3,376.54, pursuant to 11 U.S.C. § 550(a);

E.      As to the Fifth Cause of Action, entry of an order granting judgment for Plaintiff against Mango pursuant to 11 U.S.C. § 548 and awarding damages of not less than $369,738.85, reflecting the total amount of the Mango Pre-Petition Transfers;

F.      As to the Sixth Cause of Action, entry of an order granting judgment for Plaintiff against Mango pursuant to N.C. Gen. Stat. § 39-23.5 and awarding damages of not less than $369,738.85, reflecting the total amount of the Mango Pre-Petition Transfers;

G.      As to the Seventh Cause of Action, entry of an order granting judgment for Plaintiff entry of an order granting judgment for Plaintiff against Mango pursuant to N.C. Gen. Stat. § 39-23.4 and awarding damages of not less than $369,738.85, reflecting the total amount of the Mango Pre-Petition Transfers;

H.      As to the Eighth Cause of Action, entry of an order granting judgment for Plaintiff against Mango pursuant to 11 U.S.C. § 549 and awarding damages of not less than $41,228.68, reflecting the total amount of the Mango Post-Petition Transfers;

I.      As to the Ninth Cause of Action, entry of an order granting judgment for Plaintiff against Waldron pursuant to N.C. Gen Stat. § 55-8-42 and awarding damages in the amount of not less than $394,100.00 reflecting the sum of the Pre-Petition Non-Business Transfers of not less than $391,000.00 and Post-Petition Non-Business Transfers of $3,100.00;

J.      As to the Tenth Cause of Action, entry of an order granting judgment for Plaintiff against Isaac pursuant to N.C. Gen Stat. § 55-8-42 and awarding damages of not less than $805,067.53 reflecting the total amount of the Mango Pre-Petition Transfers ($369,738.85), the Mango Post-Petition Transfers ($41,228.68), the Pre-Petition Non-Business Transfers (not less than $391,000.00), and the Post-Petition Non-Business Transfers ($3,100.00); and

K.      Granting such further relief as may be just and proper.

This is the 16th day of August, 2021.

*/s/ A. Cotten Wright*
A. Cotten Wright (State Bar No. 28162)
Grier Wright Martinez, PA
521 E. Morehead St., Suite 440
Charlotte, NC 28202
Phone: 704.375.3720
Fax: 704.332.0215 Fax
cwright@grierlaw.com

*Attorneys for the Trustee*

## **VERFICATION**

I, **A. Cotten Wright**, as chapter 7 bankruptcy trustee for Yellowstone Transportation Group, Inc., Case No. 21-30050 (LTB) pending in the United States Bankruptcy Court for the Western District of North Carolina, Charlotte Division, have read the contents of the foregoing *Complaint* and know the same to be true and accurate of my own personal knowledge, except for those matters stated upon information and belief and as to those matters, I believe them to be true and accurate.

A. Cotten Wright

Sworn to before me this

the 16th of August, 2021.

Notary Public for the

State of North Carolina

My commission expires: 06/08/2024

BRITTANY L. FRANKLIN
NOTARY
MY COMMISSION EXPIRES
06/08/2024
PUBLIC
CABARRUS COUNTY, NC

1

1                    UNITED STATES BANKRUPTCY COURT
                  WESTERN DISTRICT OF NORTH CAROLINA
2                        CHARLOTTE DIVISION

3
  IN RE:                        .   Case No. 21-30050-LTB
4                               .   Chapter 11
  YELLOWSTONE TRANSPORTATION    .
5  GROUP, INC.,                 .
                                .
6        Debtor.                .
                                .
7  . . . . . . . . . . . . . .  .

8

9

10

            **TRANSCRIPT OF 341 MEETING OF CREDITORS**

11

12

13

        BEFORE SHELLEY K. ABEL, BANKRUPTCY ADMINISTRATOR
14

                    THURSDAY, MARCH 11, 2021
15

                   CHARLOTTE, NORTH CAROLINA
16

17

18

19

20

21

22

23

24

25

```
 1  APPEARANCES:

 2  For the Debtor:              Essex Richards, P.A.
                                 By:  John C. Woodman*
 3                               1701 South Boulevard
                                 Charlotte, NC  28203
 4                               (704) 377-4300

 5  For Mantis Funding:          Maurice Wutscher, LLP
                                 By:  Alan C. Hochheiser*
 6                               23611 Chagrin Boulevard
                                 Suite 207
 7                               Beachwood, OH  44112
                                 (216) 220-1129
 8
     Sub-chapter V Trustee:      Moon Wright & Houston, PLLC
 9                               By: Caleb Brown*
                                 121 West Trade Street
10                               Suite 1950
                                 Charlotte, NC  28202
11                               (704) 944-6560

12  Also Present:                Andre Isaac, President,
                                   Yellowstone Transportation
13                                 Group, Inc.*

14  Court Recorder:              Clerk's Office
                                 U.S. Bankruptcy Court
15                               401 West Trade Street
                                 Charlotte, NC  28202
16
     Transcription Service:      APLST, Inc.
17                               6307 Amie Lane
                                 Pearland, TX  77584
18                               (713) 637-8864

19  *All appearances telephonic.

20

21

22

23

24
     Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.
```

```
 1                        (Time Not Noted)

 2              MS. ABEL:  Mr. Hochheiser, tell me who you are and

 3    who you represent.

 4              MR. HOCHHEISER:  Alan Hochheiser from Maurice

 5    Wutscher, representing Mantis Funding.

 6              MS. ABEL:  Mantis Funding.  Okay.

 7         (Pause)

 8              MS. ABEL:  All right.  So we're gong to get

 9    started.

10              For purposes of the record, this is Shelley Abel.

11    I'm the Bankruptcy Administrator for the Western District of

12    North Carolina.

13              And we are here today in Yellowstone

14    Transportation Group, Inc.  That's case number 21-30050.

15              And who is here on behalf of the Debtor to testify

16    today?  I think that would be you, Mr. Isaac.

17              MR. ISAAC:  Yes.  Yes.

18              MS. ABEL:  And can you state your full name for

19    purposes of the record?

20              MR. ISAAC:  My name is Andre Isaac.

21              MS. ABEL:  Okay.  And, Mr. Woodman, would you like

22    to note your appearance?

23              MR. WOODMAN:  This is John Woodman on behalf of

24    the Debtor, Yellowstone Transportation Group, Inc.

25              MS. ABEL:  Okay.  And then, Mr. Brown, would you
```

1  like to make an appearance?

2          MR. BROWN:  Absolutely, Shelley.  Thank you.

3  Caleb Brown as the Subchapter V Trustee.

4          MS. ABEL:  All right.  Okay, so Mr. Isaac, I'm

5  going to swear you in.

6          Do you swear to tell the truth, the whole truth,

7  and nothing but the truth?

8          MR. ISAAC:  Yes, I do.

9          MS. ABEL:  All right.  So your testimony today

10 will be under oath, and we'll get started.

11          Mr. Woodman, are there any announcements or

12 amendments that we need to make at this time?

13          MR. WOODMAN:  Yes, Shelley.  So a couple of things

14 I think that you and I have spoken about, and Mr. Brown.

15          As it relates to the Statement of Financial

16 Affairs, we were working through questions 3, question 4,

17 question 9, I believe it is, which is the donations, and

18 question 30, which I see as analogous to question 4.

19          We have that information.  The tax returns have

20 been prepared and filed.  So we'll be amending the SOFA to

21 include the attachments there.

22          Specifically, the information I have for question

23 4 and question 30 as it relates to monies paid to Mr. Isaac,

24 --

25          MS. ABEL:  Uh-huh.

1          MR. WOODMAN:  Just waiting for my extremely fast

2   computer to load here.

3       (Pause)

4          MR. WOODMAN:  Sorry.  Let me see if I can get it

5   on my phone.

6          MS. ABEL:  Bless your heart.  I feel your pain.

7          MR. WOODMAN:  It's supposed to be better when

8   you're in the office than at home.

9       (Pause)

10         MR. WOODMAN:  Charitable donations are included in

11  the tax return, like I said, so we will have that attached to

12  the amended SOFA.

13         Andre received a total of $9,500.00 in the last

14  year.  Those dates are May 11th, $5,000.00; June 16th,

15  $4,000.00; and then 5/29 $500.00, for a total of $9,500.00.

16         As you're well aware, Mr. Isaac has had some

17  medical issues over the last -- probably since about July,

18  and so he's been unable to work with the Debtor on a --

19  pretty much a full-time basis because of those medical

20  issues.  But I understood he had responsibilities before his

21  medical issues.

22         And so that is what I understand was given to him

23  within the year preceding.  And those would be the amendments

24  that will be included on question 4 and question 30.

25         MS. ABEL:  Okay.  Any other amendments that need

1   to be made?

2             MR. WOODMAN:  I don't believe so at this time.

3             MS. ABEL:  Okay.  Are those the only exhibits that

4   we are missing, in your belief?  We don't have -- I mean, you

5   haven't filed any on the docket that are not among those that

6   are still to be filed, right?

7             MR. WOODMAN:  Correct.

8             MS. ABEL:  Okay.

9             MR. WOODMAN:  I think everything else was included

10  on the -- on Schedule AB, and obviously all of the creditors,

11  D through F.

12            There may be -- there is one more amendment.  I'm

13  still seeking clarification.

14            But on Schedule AB, --

15            MS. ABEL:  Uh-huh.

16            MR. WOODMAN:  -- there is a question 8, pre-

17  payments.

18            MS. ABEL:  Right.  The retainer to Poyner Spruill.

19            MR. WOODMAN:  Yes, Poyner Spruill.  We put

20  "unknown" because I didn't know what was outstanding as of

21  the Petition date.

22            MS. ABEL:  Uh-huh.

23            MR. WOODMAN:  I spoke to an attorney at Poyner a

24  could of weeks back who was going to verify for me, but he

25  does not believe there is any money left from that retainer.

 1          MS. ABEL:  Okay.  If you get an accounting, I just

 2  worry that maybe those folks might not know about pre-

 3  Petition versus post-Petition application of -- application

 4  against a retainer, and so you might -- should we just get a

 5  copy of the --

 6          MR. WOODMAN:  He's a bankruptcy attorney.

 7          MS. ABEL:  He is.  Okay.  Okay.

 8          MR. WOODMAN:  It's a bankruptcy attorney that you

 9  would know.

10          MS. ABEL:  Okay, well that's good.  All right.

11          Mr. Isaac, I want to start with just some basic

12  stuff.  Some of this stuff we covered with Dani at the intake

13  call, but you're here now and under oath, and that was just a

14  much more informal conversation.

15          So I wanted to see if you could tell me a little

16  bit about how the Debtor's business runs, you know, who were

17  typical customers, how do you find them, what is the terms on

18  which you take a load.  You know, just kind of walk me

19  through your business.

20          MR. ISAAC:  I don't have information on that.

21  What I do with the company --

22          MS. ABEL:  Okay.

23          MR. ISAAC:  -- was I worked operations, which is I

24  ensured that the trucks and the drivers -- I was a driver

25  previously, so I made sure that the trucks and the drivers

1  were in compliance and always were legal, and that the

2  drivers had all of their documents, medical cards, and they

3  kept everything up-to-date.

4        MS. ABEL:  Okay.  And I guess I should back track

5  and talk about -- I failed to ask you.  What is your

6  relationship with the Debtor?  What is your title?

7        MR. ISAAC:  I was operations manager of

8  Yellowstone.

9        MS. ABEL:  Are you the owner of the company?

10        MR. ISAAC:  Yes.

11        MS. ABEL:  Since what --

12        MR. ISAAC:  But --

13        MS. ABEL:  Okay, go ahead.

14        MR. ISAAC:  My previous experience was in law

15  enforcement and as a truck driver.  You know, I knew the

16  runnings of, you know, how to operate the trucks, the

17  drivers, and, you know, I was never really good at the

18  business side of the aspect.  That's where Dani came in.

19        MS. ABEL:  Okay.  So have you been involved with

20  the company since November of 2019?  With Yellowstone?

21        MR. ISAAC:  Yes.

22        MS. ABEL:  Okay.  When did you --

23        MR. WOODMAN:  And, Shelley, just to clarify,

24  Shelley, the Debtor didn't operate until March of 2020.

25        MS. ABEL:  Right.

1            MR. WOODMAN:  So there was a period in which it

2    was created in November, but it started operating in March.

3            MS. ABEL:  Okay.  And, Mr. Isaac, when did you

4    first contract with Dani's company?

5            MR. WOODMAN:  I've known Dani a while.  I've known

6    Dani a while.  And I know she's very experienced and

7    knowledgeable, you know, about the business aspect of, you

8    know, trucking.

9            MS. ABEL:  And I guess we're being informal.  I've

10   forgotten last name, Mr. Woodman.  Do you have it in your

11   head?

12           MR. WOODMAN:  Yes, it's Levine.

13           MS. ABEL:  Dani Levine.  And she works with RTF

14   Financial Services, is that correct, Mr. Isaac?

15           MR. ISAAC:  Yes.

16           MS. ABEL:  No, yes, maybe.  I might not be right.

17   Does she work with RTF?  Is that the name of the company that

18   she works for?

19           MR. ISAAC:  I'm not sure if that's the company she

20   works for.  I can't -- I don't know at this time.  I don't

21   want to say yes because I'm under oath, but I don't -- I

22   don't know.

23           MS. ABEL:  Okay.

24           MR. WOODMAN:  Shelley, I can tell you Dani has a

25   Yellowstone email address, and one of the email addresses

1   that Penske had in the record was a Mango Capital.  And when

2   I asked Dani about that, that's what I understood was the

3   consulting company that she uses.

4            MR. ISAAC:  Yes.

5            MS. ABEL:  Okay.  I was all kinds of wrong, then.

6   I apologize.

7            MR. WOODMAN:  But I can find out.  What was the

8   name of the entity you asked?  RTF Financial?

9            MS. ABEL:  Yes.  I went to a conclusion, and I

10  apologize for doing that.  It was in the Schedule G, and it

11  is the Dispatch software.  And so I was thinking that was

12  her, but I'm now realizing that she was -- that they're two

13  different things.

14           Is there a written agreement between Mango Capital

15  and the Debtor?  Or whoever Dani works for?

16           MR. WOODMAN:  Andre, do you know if there's an

17  agreement between Yellowstone and Dani's consulting group?  A

18  written agreement?

19           MR. ISAAC:  There might be, but Dani would be more

20  better to answer that question.

21           MS. ABEL:  Okay.  Let me ask you a couple of other

22  questions about some folks that I don't know.

23           Do you know Ian Mullings?

24           MR. ISAAC:  No.

25           MS. ABEL:  So you don't --

 1              MR. ISAAC:  He doesn't sound familiar at this

 2  time, no.

 3              MS. ABEL:  You don't know that name.  Do you know

 4  Dionne Waldron?

 5              MR. ISAAC:  The name doesn't sound familiar at

 6  this time, no.

 7              MS. ABEL:  Okay.

 8              MR. WOODMAN:  And, Shelley, --

 9              MR. ISAAC:  I'm not familiar with that name.

10              MR. WOODMAN:  -- I can tell you I understand

11  Dionne was a former consultant, independent contractor, for

12  the Debtor, and is no longer.

13              MS. ABEL:  Okay.  Would Dionne Waldron be

14  associated with Dani, or separately?

15              MR. WOODMAN:  I don't know that.  When I asked

16  about Dionne, as I saw Dionne on an agreement, I understood

17  that Dionne is no longer with the Debtor.  But I will find

18  out if Dionne has any relationship to Dani.

19              MS. ABEL:  Okay.  Yeah, the only thing, I was sort

20  of hoping that Mr. Isaac might be able to look at some

21  documents with us, but I guess that's not going to work since

22  he's connected by a telephone.

23              Mr. Isaac, has anybody other than you ever been an

24  officer or a director of the Debtor's corporation?  The

25  Yellowstone Transportation Group, Inc. corporation?

1            MR. ISAAC:  Have anybody else but me?  Could you

2    state that again, ma'am?

3            MS. ABEL:  Yes, sir.

4            MR. ISAAC:  I'm not sure I understand.

5            MS. ABEL:  Has anyone other than you, Andre Isaac,

6    been an officer or a director of Yellowstone Transportation

7    Group?

8            MR. ISAAC:  No, not to my knowledge.

9            MS. ABEL:  Okay.  And so you were the owner --

10            MR. ISAAC:  I apologize.  Yes.

11            MS. ABEL:  Okay.  You were the owner.  Are you

12    also the CEO or president, or what other titles do you use?

13            MR. ISAAC:  President.

14            MS. ABEL:  President?

15            MR. ISAAC:  President.

16            MS. ABEL:  Okay.  Since what time have you been

17    president?

18            MR. ISAAC:  I'm thinking.  If my memory serves me

19    right, since it would be like -- like November 2019, I think.

20            MS. ABEL:  Okay.  Did you have an attorney help

21    you set up the company?

22            MR. ISAAC:  Everything was done by Dani.

23            MS. ABEL:  Okay.  What made you decide to start

24    Yellowstone Transportation Group?

25            MR. ISAAC:  I was formerly a truck driver, and,

1  you know, I knew there was money to be made within the

2  trucking industry, you know.  And, you know, I had a

3  conversation with Dani, and we decided to give it a go.

4             MS. ABEL:  Okay.

5             MR. ISAAC:  Because I'm a retired Vet with

6  injuries, and even my eyesight is starting to deteriorate, so

7  I know I couldn't be on the road, you know.  I don't want to

8  be on the road driving anymore.

9             MS. ABEL:  Okay.

10            MR. ISAAC:  So, you know.

11            MR. WOODMAN:  Shelley, as it relates to your

12  question in whether he had an attorney start the company, I

13  just pulled up the Secretary of State and it says that it

14  looks like Small Biz Agents, LLC, was the one that help form

15  the entity.

16            MS. ABEL:  We can talk about that some more after

17  the 341, Mr. Woodman.

18            Mr. Isaac, do you maintain any of the books and

19  records for the Debtor?

20            MR. ISAAC:  No.

21            MS. ABEL:  Pardon me.  Could you repeat your

22  answer?

23            MR. ISAAC:  Oh, no.  No, I don't.

24            MS. ABEL:  Okay.  Do you receive reports of any of

25  the Debtor's books and records periodically?

1              MR. ISAAC:  Within the last few months, I haven't

2  received anything really in writing because I've mostly been

3  bed ridden since July of last year.  Just trying to get back

4  into rehab after my stroke.

5              MS. ABEL:  And I'm sorry to hear about your

6  medical problems.

7              MR. ISAAC:  But Dani usually -- she usually calls

8  me over the phone sometimes and speaks to me about how stuff

9  is going.

10             MS. ABEL:  Okay.  So could you speak to the

11 Debtor's accounts receivable at all?  Do you have any

12 awareness of the Debtor's accounts receivable?

13             MR. ISAAC:  No.

14             MS. ABEL:  How about the Debtor's office

15 equipment?  There's a -- no, those are just cells phones and

16 GPS equipment.  Disregard.

17             There's a desk, a printer, and a computer.

18             MR. ISAAC:  Office equipment, no, ma'am.

19             MS. ABEL:  I'm sorry?

20             MR. ISAAC:  No, ma'am.

21             MS. ABEL:  Does the Debtor own a desk and a

22 printer and a computer?  And, if so, where is that located?

23             MR. ISAAC:  I am sure she does.

24             MS. ABEL:  You mean Dani would own those things?

25             MR. ISAAC:  Hello?

1          MS. ABEL:  Are you all having trouble hearing me?

2          MR. WOODMAN:  I can hear you.

3          MR. ISAAC:  Yes, ma'am.

4          MR. WOODMAN:  Shelley, I can maybe slice that

5    question up for you.

6          So, Dani said that those items are located at the

7    301 McCullough address here in Charlotte.

8          MS. ABEL:  Okay.

9          MR. WOODMAN:  They had got a physical location,

10   and due to COVID they never really fully operated out of it.

11         MS. ABEL:  Mr. Isaac, have you ever been to 301

12   McCullough, which is the Debtor's listed address?

13         MR. ISAAC:  No.

14         MS. ABEL:  Mr. Woodman, have you ever been to 301

15   McCullough?  Mr. Woodman, have you been there?

16      (No response)

17         MS. ABEL:  You have not?

18         MR. WOODMAN:  I have not.

19         MS. ABEL:  Okay.  I think that that's a virtual

20   office.  I don't think it's a real place that you can -- I

21   don't think there's a physical location, so that's why I was

22   wondering where those items might be.

23         What is a load bar, Mr. Isaac?

24         MR. ISAAC:  A load bar.  That's what you use to

25   prevent the load on the trailer from shifting.

1          MS. ABEL:  So it would be located inside the

2   trailer, or running?

3          MR. ISAAC:  Once the trailer is loaded, you apply

4   the load bar to the end of the trailer, to the end of it, so

5   that it don't shift.  But usually for storage, some people

6   keep it in the trailer when the trailer is empty.  Otherwise,

7   it is strapped to the truck.

8          MS. ABEL:  Got it.  Okay.  Does the Debtor have a

9   specific place where the trucks are parked when they're not

10  operating?

11         MR. ISAAC:  Not to my knowledge.  The trucks

12  should always be moving.

13         MS. ABEL:  Okay.  Does the Debtor have a storage

14  facility anywhere?

15         MR. ISAAC:  Storage?  Not to my knowledge, ma'am.

16  No.

17         MS. ABEL:  Okay.  Give me just a second.

18      (Pause)

19         MS. ABEL:  I should have started with some of

20  these more basic questions, Mr. Isaac.  I apologize.

21         Have you reviewed the Schedules and Statements

22  before they were filed?

23         MR. ISAAC:  If I have reviewed the -- yes, hold

24  on.

25      (Pause)

1          MS. ABEL:  Mr. Isaac, are you answering me, or

2  not?  I can't tell if you are.

3          MR. ISAAC:  Oh, I'm here.  I'm sorry.  I'm just a

4  little -- I'm sorry, ma'am.  I'm just a little winded.

5          MS. ABEL:  I can tell.

6          MR. ISAAC:  I'm sorry.

7          MS. ABEL:  Okay.

8          MR. ISAAC:  Yeah, because I can't breathe through

9  my nose, so.

10          Can you repeat the question?

11          MS. ABEL:  Yes.  I was just asking whether you

12  reviewed the Schedules and Statements before you signed them.

13          MR. ISAAC:  I scanned them, but to be honest,

14  ma'am, in the last -- since July, I put my trust in Dani.

15          MS. ABEL:  Okay.

16          MR. ISAAC:  So.

17          MS. ABEL:  Okay.  Well, let me -- yeah, let me ask

18  -- let's see.  Let me think about what I should do next.

19          Why don't I ask our friends here who have appeared

20  if they have any questions for you while I try to figure out

21  what to do with the rest of this time.

22          Mr. Hochheiser, would you like to ask any

23  questions?

24          MR. HOCHHEISER:  Yes.  I have two brief questions,

25  Mr. Isaac.

1                    And, again, for the record Alan Hochheiser on

2     behalf of Mantis Funding.

3                    Are you aware that Yellowstone sold receivables to

4     Mantis Funding on December 30th of 2020, for the sum of

5     $40,000.00?

6                    MR. ISAAC:  So, about the figure?

7                    MR. HOCHHEISER:  What happened to the proceeds

8     that Yellowstone received?  What were they used for?

9                    MR. ISAAC:  Well, it was supposed to be for the

10    operations of the company.

11                   MR. HOCHHEISER:  Okay.  But you're not sure what

12    they were used for?

13                   MR. ISAAC:  Well, that's what it's for.

14    Operations of the company.

15                   MR. HOCHHEISER:  Okay.  And you personally signed

16    on that obligation, as well as president of Yellowstone?

17                   MR. ISAAC:  Yes.

18                   MR. HOCHHEISER:  Okay.  So your health was good

19    enough for you to review those papers and sign off on them?

20                   MR. ISAAC:  Could you say that again, sir?  Sorry.

21                   MR. HOCHHEISER:  I said on December 30th your

22    health was okay that you could review those papers, you fully

23    knew what you were doing, and signed them?

24                   MR. ISAAC:  Dani told me that it was, you know, to

25    cover expenses for the company.  I had them signed and sent

1  back, yes.

2  　　　　　　MR. HOCHHEISER:  Okay.  And at that time, you had

3  a -- Yellowstone had a bank account with Wells Fargo.  Do you

4  recall that?

5  　　　　　　MR. ISAAC:  No.  Like I said, back end information

6  and stuff, I would have to speak to Dani about it.

7  　　　　　　MR. HOCHHEISER:  Okay.  So you wouldn't be aware

8  that there was $84,000.00 in that bank account at the end of

9  December?  On December 31st?

10  　　　　　　MR. ISAAC:  No.

11  　　　　　　MR. HOCHHEISER:  I'm taking that as a "no."  One

12  last question.  And I appreciate you answering these.

13  　　　　　　According to the Secretary of State, when the

14  corporation was formed in November of 2019, there were 200

15  shares of common stock issued.  Were you the holder of those

16  200 shares?

17  　　　　　　MR. ISAAC:  No.

18  　　　　　　MR. HOCHHEISER:  I'm sorry.  Was that "no?"

19  　　　　　　MR. ISAAC:  No, I'm not aware of that.  No.

20  　　　　　　MR. HOCHHEISER:  Okay.  So do you know who owns

21  the shares or holds the shares of Yellowstone?

22  　　　　　　MR. ISAAC:  No.

23  　　　　　　MR. HOCHHEISER:  Thank you.  I have no further

24  questions at this time.

25  　　　　　　MR. WOODMAN:  Shelley, can I clarify a couple of

1    things?

2                MS. ABEL:  Yes.

3                MR. WOODMAN:  Yes.  Okay.  Mr. Isaac, are you the

4    sole owner of Yellowstone?

5                MR. ISAAC:  At the moment, yes.

6                MR. WOODMAN:  Okay.  Has there ever been any other

7    owners of Yellowstone?

8                MR. ISAAC:  Not that I know of.  No.

9                MR. WOODMAN:  So from November 2019 until today,

10   you are the only owner?

11               MR. ISAAC:  Yes.

12               MR. WOODMAN:  And you have been the only owner?

13               MR. ISAAC:  Yes.

14               MR. WOODMAN:  So when Mr. Hochheiser asks about if

15   you are the holder of shares, where does your confusion lie

16   as it relates to if you are the holder of the shares, or not?

17               MR. ISAAC:  Well, I don't understand what shares.

18   I'm the owner of the company.

19               MR. WOODMAN:  Okay.  That's fine.

20               MR. ISAAC:  The shares, 200 shares, I have no

21   idea.

22               MR. WOODMAN:  So you don't necessarily know how

23   many shares you have, but you are testifying that you are the

24   owner of Yellowstone and have always been the owner of

25   Yellowstone?

1          MR. ISAAC:  Yes.

2          MR. WOODMAN:  Okay.  I hope that clears up that

3   component.

4          MS. ABEL:  Okay.

5          MR. WOODMAN:  Thank you.  Ms. Abel asked you about

6   the Statement of Financial Affairs and the Schedules that

7   were filed in this case.

8          MR. ISAAC:  Right.

9          MR. WOODMAN:  And you may recall the Schedules

10  list out the assets and debts, and the Statement of Financial

11  Affairs deals with the transfers and other operations of the

12  Debtor, such as books and records and owner.

13         MR. ISAAC:  Right.

14         MR. WOODMAN:  And it's your testimony that you

15  reviewed those prior to signing them and giving them to my

16  office.  Is that correct?

17         MR. ISAAC:  Yes.  Yes.

18         MR. WOODMAN:  Thank you.  I just wanted to clarify

19  those two things, Shelley.

20         MS. ABEL:  Okay.  And I have a feeling that we're

21  not going to -- some of the answers to the last questions I

22  have.  I'm going to come back to you, Mr. Brown.

23         Are you aware that there was a UCC financing

24  statement filed against the company in February of this year?

25         MR. ISAAC:  A UCC?

1          MS. ABEL:  Yes.  It's a type of document that a

2  lender records when they give you money.  Did you borrow any

3  money in January of February of this year on behalf of the

4  company, or sell your receivables?

5          MR. ISAAC:  I don't remember.  I believe between

6  the period of December -- January --

7          MS. ABEL:  I'm sorry.  If you're -- could you

8  answer the question?  Did you borrow any money in January or

9  February of this year?

10      (No response)

11          MS. ABEL:  Mr. Isaac, are you still there?

12          MR. ISAAC:  Oh, yes.  Did you hear my answer?

13          MS. ABEL:  I did not.  Could you try again?

14          MR. ISAAC:  Oh.  Okay.  Yes, I said between -- I

15  believe that in January I did sign an agreement.  I can't

16  recall at this moment, at this particular moment, who it was

17  with.

18          MS. ABEL:  Would you have a record of any of that

19  in your email or elsewhere?

20          MR. ISAAC:  It's possible I have it in my email.

21  I'm sure it's in my email somewhere.

22          MS. ABEL:  Okay.  There was a demand made by the

23  Tennessee Bureau of Workers' Compensation that's reflected in

24  your Statement of Financial Affairs.  Do you know anything

25  about that demand?

1          MR. ISAAC:  Not off the top of my head.

2          MS. ABEL:  Okay.  What is your relationship with

3   Account Edge, LLC, or May Jiang?  I think that might be

4   someone who has done your books and records.  Do you

5   recognize that name?

6          MR. ISAAC:  No, I can't recall the name at this

7   moment, ma'am.

8          MS. ABEL:  Okay.

9          MR. WOODMAN:  Shelley?

10         MS. ABEL:  Uh-huh.

11         MR. WOODMAN:  If you'd like, I can provide some

12  clarity on that one if you'd like me to.

13         MS. ABEL:  We just need to let Mr. Isaac answer.

14         MR. WOODMAN:  Okay.

15         MS. ABEL:  Mr. Isaac, do you have any awareness or

16  record of how much money has been paid to Mango Capital by

17  Yellowstone?

18         MR. ISAAC:  I probably do, but I can't give a

19  figure of the amount.  I would have to go back into my email

20  to go through it, ma'am.

21         MS. ABEL:  You don't have even an approximation?

22  No idea right now?

23         MR. ISAAC:  No.  Ma'am, I don't want to give you a

24  -- I'm under oath, and I don't want to give you a figure off

25  the top of my head.  And I don't know, ma'am.

1          MS. ABEL:  Okay.  Do you know who prepared the

2   Debtor's 2020 tax returns?

3          MR. ISAAC:  Could you say that again?

4          MS. ABEL:  Do you know who or what entity prepared

5   the Debtor's 2020 tax returns?

6          MR. ISAAC:  No.

7          MS. ABEL:  Did you sign the tax returns?

8          MR. ISAAC:  For 2020?

9          MS. ABEL:  Yes, sir.

10         MR. ISAAC:  No, I don't think I signed that, no.

11         MS. ABEL:  Okay.  Mr. Brown, do you have any

12   questions for the Debtor?

13       (No response)

14         MS. ABEL:  I'm sorry, I wasn't looking.

15         MR. BROWN:  I was trying to find my mute button,

16   Shelley.  Sorry for the delay.

17         MS. ABEL:  Okay.  That's okay.

18         MR. BROWN:  Let me take a shot at asking a couple

19   of quick questions of Mr. Isaac.

20         Mr. Isaac, you show on your Schedules a debt to

21   BMW Financial Services.  Could you tell me anything about

22   that debt?

23         MR. ISAAC:  No.

24         MR. BROWN:  Okay.  And same question for another

25   debt scheduled for GM Financial of about $66,000.00, I

1  believe.  Can you tell me anything about that debt and what

2  that was for?

3          MR. ISAAC:  No.  No.

4          MR. BROWN:  Okay.  It says also on your Schedules,

5  on Schedule G, with your executory contracts, for BMW

6  Financial Services, it says Yellowstone is involved in a

7  executory contract with them for a vehicle.  Can you tell me

8  anything about the vehicle?  Is that something --

9          MR. ISAAC:  No, I can't.

10          MR. BROWN:  Okay.  Do you remember, Mr. Isaac,

11  when you founded Yellowstone, did you make an initial capital

12  contribution to the company?  Did you put money in when it

13  started?

14          MR. ISAAC:  Yes.

15          MR. BROWN:  Do you remember how much that was?

16          MR. ISAAC:  It was like maybe $1,500.00.

17          MR. BROWN:  And have you made any other capital

18  contributions while Yellowstone has been operating, or was it

19  just --

20          MR. ISAAC:  No.

21          MR. BROWN:  Okay.  Thank you, Mr. Isaac.  Shelley,

22  I don't think I have any other questions right now.

23          MS. ABEL:  Okay.  Mr. Woodman, if I wanted to

24  speak with Dani, is that something that is possible, in your

25  estimation?

1          MR. WOODMAN:  I would advise for that to occur,

2    yes.  So I can ask that and try and make that as easy as

3    possible.

4          MS. ABEL:  Okay.  And I can file a 2004 exam, if

5    need be.

6          MR. WOODMAN:  Let's try and avoid that.  I don't

7    think you necessarily have to.  Obviously, I think what we

8    can tell is that due to Mr. Isaac's health, he just hasn't

9    been able to be on the front lines with the company to the

10   level that needs to be to answer a lot of these questions.

11         And so I think it's a fair request for you to ask

12   for Dani.

13         MS. ABEL:  Okay.  And would we do that in the

14   context of the 341 meeting -- a continued 341 meeting, or

15   should I conclude the 341 and then we negotiate a 2004?

16         MR. WOODMAN:  Continue.

17         MS. ABEL:  Continue.  Okay.

18         MR. WOODMAN:  I think that's the easiest.  And, I

19   mean, for the record, I'm trying to not answer a lot of these

20   questions because, as I discussed with Mr. Isaac, this is his

21   testimony and he's aware of that.

22         I think a lot of these answers that you're looking

23   for can be answered through Dani.

24         MS. ABEL:  Okay.  Well, that's what I think we

25   should do, then, is continue this out another week, and we

1  would ask for Mr. Woodman to have Dani appear for

2  questioning.

3          And if that's not going to be available, if you

4  would let us know so we can note that on the docket.

5          MR. WOODMAN:  Okay.

6          MS. ABEL:  Does that work for everybody?

7          MR. WOODMAN:  Yes.

8          MS. ABEL:  Okay.  All right.  Well, I think with

9  that we're going to conclude for today.

10          I appreciate you appearing, Mr. Isaac.  I can tell

11  this is not the easiest thing for you, and I appreciate you

12  taking the time and energy to try to answer our questions.

13          And I appreciate everybody's patience today.

14          MR. ISAAC:  And I appreciate your patience.

15          MR. WOODMAN:  Shelley, I think Andre should answer

16  the question as it relates to Dani, as well, if he has any

17  issues from the Debtor's perspective of Dani appearing at the

18  continued 341.

19          MS. ABEL:  That would be excellent for you to

20  answer, Mr. Isaac.  Do you have believe that Dani is

21  competent to testify on behalf of Yellowstone Transportation

22  Group?

23          MR. ISAAC:  Yes, I do.

24          MS. ABEL:  Okay.  We'll see what we can do with

25  that.

1          All right.  Well, with that, unless somebody else

2   has a question, holler if you do.  But I think we can

3   conclude today for further continuance a week from today.

4          We might have to set this at 1:00 o'clock, Mr.

5   Woodman, instead of 2:00, because I think I have another 341

6   at 2:00 o'clock next week.

7          Would that be okay with you, or would you rather

8   go at 3:00 p.m.?

9          MR. WOODMAN:  I have a 2:00 o'clock appointment,

10  so if we're done by 2:00, great.  If not, I'd rather go to

11  3:10.

12         MS. ABEL:  Okay.  Let's do 3:15.

13         MR. HOCHHEISER:  3:00 works better for me also.

14         MS. ABEL:  Okay, great.  Let's do that.  Let's do

15  3:15 next week.  And I will send out a Zoom link to everybody

16  for that.  Actually, the same link will probably work.  We'll

17  just carry it over to next week.

18         All right, everyone.  Thank you for your time.

19         MR. WOODMAN:  I'll give you a call and kind of

20  just talk over a couple of things.

21         MS. ABEL:  That sounds good.  Thank you.

22         MR. WOODMAN:  Okay.  Thank you.

23         MS. ABEL:  Okay.  Bye-bye.

24                  (Time Not Noted)

25                  *  *  *  *  *

1                              CERTIFICATE

2         I, RANDEL RAISON, certify that the foregoing is a

3    correct transcript from the official electronic sound

4    recording of the proceedings in the above-entitled matter, to

5    the best of my ability.

6

7

8    _____            April 16, 2021

9    Randel Raison

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT B**

| Date | Description | Amount |
|---|---|---|
| 3/23/20 | Mango Capital | $9,800.00 |
| 3/24/20 | Mango Capital | $6,000.00 |
| 3/30/20 | Mango Capital | -$1,000.00 |
| 3/31/20 | Mango Capital | -$8,500.00 |
| 4/1/20 | Mango Capital | -$9,500.00 |
| 4/14/20 | Mango Capital | -$3,000.00 |
| 4/16/20 | Mango Capital | -$18,500.00 |
| 4/23/20 | Mango Capital | -$23,500.00 |
| 5/4/20 | Mango Capital | -$2,500.00 |
| 5/6/20 | Mango Capital | -$1,000.00 |
| 5/11/20 | Mango Capital | -$2,500.00 |
| 5/12/20 | Mango Capital | -$400.00 |
| 5/18/20 | Mango Capital | -$104,500.00 |
| 6/9/20 | Mango Capital | -$2,000.00 |
| 6/9/20 | Mango Capital | -$1,500.00 |
| 6/15/20 | Mango Capital | -$157.50 |
| 6/25/20 | Mango Capital | -$30,000.00 |
| 7/2/20 | Mango Capital | -$25,000.00 |
| 7/8/20 | Mango Capital | -$157,881.35 |
| 7/16/20 | Mango Capital | -$1,500.00 |
| 7/29/20 | Mango Capital | -$3,000.00 |
| 8/12/20 | Mango Capital | -$3,000.00 |
| 8/13/20 | Mango Capital | -$1,500.00 |
| 8/20/20 | Mango Capital | -$3,400.00 |
| 8/20/20 | Mango Capital | -$1,000.00 |
| 8/24/20 | Mango Capital | -$2,500.00 |
| 8/27/20 | Mango Capital | -$3,000.00 |
| 9/10/20 | Mango Capital | -$2,000.00 |
| 9/15/20 | Mango Capital | -$700.00 |
| 9/17/20 | Mango Capital | -$3,500.00 |
| 9/30/20 | Mango Capital | -$2,500.00 |
| 10/5/20 | Mango Capital | -$2,500.00 |
| 10/6/20 | Mango Capital | -$1,500.00 |
| 10/8/20 | Mango Capital | -$300.00 |
| 10/20/20 | Mango Capital | $40,000.00 |
| 10/29/20 | Mango Capital | -$200.00 |
| 11/17/20 | Mango Capital | -$2,000.00 |
| | TOTAL | -$369,738.85 |

**EXHIBIT C**

Carleen Greenidge
(https://carleengreenidge.com)

≡

# About



## Education & Early Career

In 1986 Greenidge migrated from Trinidad and Tobago to the United States. At Sixteen years of age and fresh
out of high school, Greenidge was eager to begin their professional career
(https://medium.com/@CarleenGreenidge). After completing the entrance exam at Hunter College and

qualifying for a second year, Greenidge took a part-time job as a telemarketer at Kirby Vacuums. Impressed by the sales process at the company, Carleen decided to give up a steady wage of $4.65/hr for compensation composed strictly of commission. During the first week, Carleen made over $1,000, and by the age of seventeen, Greenidge had made over $70,000 in commission. With a natural talent for sales, Carleen continued to generate five figures annually as a teenager and into their youth.

Greenidge remained at Kirby until the age of nineteen, and despite receiving many accolades, the most important lesson Carleen took away from the experience is that hard work and determination are fundamental to success. It was while working at Kirby that Carleen decided to leave college and pursue a career in sales.

## Working In The Transportation Industry

In 1990 Greenidge moved on to the transportation industry, and after gaining relevant work experience decided to take the leap and launch their first business in 1995. However, soon after establishing the first venture, Greenidge realized it would be next to impossible to secure adequate funding and was forced to shift the attention to various other projects.

Despite the setbacks and challenges faced in those early days, Greenidge has successfully advanced in the field. Carleen has worked in, developed and managed every aspect of the transportation industry, safety & compliance, capacity, dispatch, claims, operations, training, etc. and has generated over $100 Million in sales.

In 1997, Greenidge became certified as a Certified Moving Consultant from the American Moving & Storage Association, and studied the RIM " Registered International Mover" and Claims Analyst course with that association.

## Recent Projects

In 2017 Carleen founded Mango Capital Inc., a small business loan brokerage and has partnered with some of the largest alternative lenders in the industry with access to over $500,000,000 monthly in cash to extend to small businesses. During that year, Carleen also founded and launched a small business credit builder platform to assist small businesses in becoming fundable and giving them access to capital.

25 years after opening the first company, Greenidge is now the proud holder of a range of transportation and logistics companies (https://carleengreenidge.com/blogs/). Currently, Carleen owns companies such as Road Scholar Staffing, Yellowstone Transportation Group, Mango Capital, Speedy Dispatch Solutions, JEP Insurance Group, Greenidge Transportation Group, and Exact Accounting Solutions.

In the past 12 months alone, Greenidge's entrepreneurial ventures have grown significantly; they show notable promise for future expansion in the coming years. More than anything, Carleen looks forward to gaining further experience in the field and moving several companies towards further expansion.

In addition to the launch and acquisition of their own companies, Greenidge's background in the transportation and logistics field has also included a range of partnerships with prominent industry leaders. Throughout the course of Greenidge's career, Carleen has worked with companies such as Mayflower Van Lines, National Van Lines, Bekins Van Lines, Signature Van Lines, and Certified Moving Consultants.

Carleen Greenidge: Transportation Entrepreneur | Cresco, PA



Stay Connected

M
(htt
ps:/
/me
diu
m.c
om/
@C
arlG
een
ree
nid
ge)

(htt
ps:/
/twi
tter.
co
m/c
arle
en9
047
)